# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

WILLIE P. HOLMAN, JR.,     )
    )
    Plaintiff,     )
    )    No. 02 C 6351
    vs.     )    Magistrate Judge Schenkier
    )
REVERE ELECTRIC SUPPLY CO.,     )
an Illinois corporation,     )
    )
    Defendant.     )

## MEMORANDUM OPINION AND ORDER[1]

The parties in this case, plaintiff Willie P. Holman, and defendant Revere Electric Supply

Co., have filed cross-motions for summary judgment. The defendant seeks summary judgment on

all the claims alleged in plaintiff's amended complaint, namely, on Counts I through VI. However,

plaintiff seeks summary judgment on only one claim: the retaliatory termination claim in Count VI.

Pursuant to FED.R.CIV.P. 56(e), defendant also has filed motions to strike the affidavits of Ronald

Wicks, Nick Bryant, and plaintiff, and certain letters written by Rafael Molinary."[2]

For the reasons discussed below, the Court denies the motions to strike; denies plaintiff's

motion for summary judgment on Count VI (doc. # 40); and grants defendant's motion for summary

judgment on all counts of the amended complaint (doc. # 39).

---

[1]By consent of the parties and pursuant to 28 U.S.C. § 636(c), the case has been assigned to this Court for all proceedings, including the entry of final judgment (doc. ## 13-15).

[2]Defendant's motions to strike are not docketed separately because defendant included these motions in its compendium of exhibits to the motion for summary judgment, along with its Reply Memorandum, which has also not been docketed separately, for the same reason. This is an obscure way of filing important legal documents, and the Court does not recommend that approach to any party appearing in this Court. Nor did the defendant file a notice of filing the motions to strike, which would have promptly brought them to the attention of plaintiff and the Court. For that reason, although plaintiff did not promptly respond to the motions to strike, by an order dated February 10, 2005, the Court gave plaintiff leave to respond to those motions (doc. # 47). On February 18, 2005, plaintiff timely did so (doc. ## 48-54).

# I.

We begin the discussion with the legal standards that govern summary judgment motions, which are well-established. Summary judgment is proper if the record shows that there is no genuine issue as to any material fact, and that the moving parties are entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Where the issues to be decided are purely legal, and the parties have filed cross-motions for summary judgment on that issue, the Court must resolve the legal issue and enter judgment "as a matter of law" for one side or the other. Where resolution of the legal issue ends the case, a final judgment is entered on cross motions under Rule 56(c) for the prevailing party.

With regard to factual issues, a genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50; *see also Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909 (1988). In deciding a motion for summary judgment, the Court must view all evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977 (1987).

When a material fact or a set of facts yields competing, but reasonable, inferences, then there is a genuine issue that precludes summary judgment. The non-moving party's burden is to identify facts that are both material and genuinely disputed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To be material, a fact must be able to affect the outcome under the substantive law governing the motion. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 595-99 (7th Cir. 2000). A

2

"genuine issue" exists if a reasonable trier of fact could find in favor of the non-moving party. *Id.* at 599. To establish a genuine issue, the party opposing the motion for summary judgment must serve and file, pursuant to Local Rule 56.1, a concise statement outlining the material facts that require denial of summary judgment, supported by citations to the evidentiary materials that support those denials (*e.g.,* affidavits, depositions, answers to interrogatories, admissions etc.). FED.R.CIV.P. 56(c). Although the party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact, *Celotex,* 477 U.S. at 323, the non-moving party cannot rely upon the pleadings alone, but must use the evidentiary tools outlined above to identify the material facts that show there is a genuine issue for trial. *Id.* at 324; *Insolia,* 216 F.3d at 598.

## II.

As the parties are aware, the Court has already accepted as undisputed facts any matters to which the parties stipulated in the final pretrial order (doc. # 38). Defendant's statement of material facts include those stipulated facts, as well as others (*see* Def.'s Statement of Facts Not in Dispute, ¶¶ 11, 25-37, 43, 45-46, 48, 52a, 53, 55, 56a, 56b, 57-58, 63-71). Plaintiff has failed to make a specific response to any of the paragraphs of defendant's fact statement, as plaintiff was required to do under Local Rule 56.1(b)(3)(A). We have reviewed the facts set forth in defendant's statement and find them supported by evidence defendant has submitted (except for paragraph 58, which is a conclusory statement we disregard). Thus, in light of plaintiff's failure to controvert those facts as required by Local Rule 56.1(b)(3)(A), we deem the facts set forth in defendant's statement to be admitted. Our enforcement of this requirement should come as no surprise to plaintiff: when the Court set the summary judgment schedule, it alerted the parties that "the Court will require that the

parties' summary judgment papers strictly comply with the requirements of Local Rule 56.1" (doc. # 37).

We note that the plaintiff has offered a statement of disputed facts in response to the defendant's motion for summary judgment (doc. #41). Although this statement is not labeled as one made pursuant to Local Rule 56.1(b)(3)(B), which authorizes a respondent to offer a statement of "additional facts that require the denial of summary judgment," that is what we surmise the statement to be, because: (1) the factual matters asserted in it are different than those set forth in defendant's fact statement; and (2) they are offered by plaintiff to support denial of defendant's motion for summary judgment. Accordingly, we treat plaintiff's statement of disputed facts as a statement of additional facts under Local Rule 56.1(b)(3)(B).

Defendant has not offered a factual response to this additional statement, and we therefore normally would treat the factual assertions which have evidentiary support as admitted for purposes of the motion. *See* Local Rule 56.1(a)(3) ("All material facts set forth in the statement filed pursuant to Section (b)(3)(B) will be deemed admitted unless controverted by the statement of the moving party"). But, here, instead of offering an evidentiary response to plaintiff's statement, defendant has moved to strike the evidentiary support plaintiff has offered for his statements. Three of these motions challenge purported "affidavits" of Messrs. Holman, Bryant and Wicks; a fourth motion challenges two letters offered by plaintiff. Therefore, before deciding whether to adopt plaintiff's statement of additional facts, we consider the motions to strike.

4

**A.**

We begin by addressing two questions common to all three motions to strike the affidavits

of Messrs. Bryant, Holman and Wicks. *First,* defendant correctly points out that the original

affidavits in fact are not "affidavits," because they bear no notary seal and thus provide no assurance

that they were in fact signed on oath in the presence of a notary. *See Pfeil v. Rogers,* 757 F.2d 850,

859 (7th Cir. 1985) an affidavit must be "sworn to before someone who is authorized to administer

an oath." Nor did the original "affidavits" comply with the format required for them to qualify as

declarations under 28 U.S.C. § 1746, which would entitle them to be given the same force and effect

as an affidavit. Plaintiff has now cured this defect – albeit in an unusual way, by submitting for each

of the three individuals new affidavits which attest, on oath, that what was in their prior unnotarized

statements is true. Thus, we will treat the Bryant, Holman and Wicks affidavits as affidavits.

*Second,* defendant seeks to strike statements from the affidavits that they relate to events

predating April 7, 1999, which is 300 days before plaintiff filed his first administrative charge. As

we explain below (*see* pp. 27-28, *infra*), events that predate the 300-day filing period may not be

offered as the basis for a claim of liability or damages, but evidence of those events nonetheless may

be relevant to prove discrimination within the 300-day period. Therefore, we reject defendant's

motion to categorically strike statements from the affidavits merely because they relate to events

prior to April 7, 1999.

Turning to the specific requests to strike, we begin with the Bryant affidavit. Defendant

seeks to strike paragraphs 3 through 11 of that affidavit. We grant the motion as to paragraphs 3-5

and 7-9. The statement in paragraph 3 that there were "incidents of anti-Black racial bias during the

time of plaintiff's years of employment and termination," is conclusory; it fails to provide any

5

meaningful time frame; and it fails to identify persons who allegedly acted in a way to reflect bias. Paragraph 4, which states that plaintiff performed his job duties "in an acceptable manner," lacks foundation, as there is no evidence that Mr. Bryant was plaintiff's supervisor or otherwise observed his work. Paragraph 5, which states that a human resources manager, Judy Adamczyk, subjected plaintiff to "undue verbal harassment" that Mr. Bryant witnessed, does not provide any detail as to what the harassment involved or when it occurred. Paragraphs 7 and 8, which allege disparate disciplinary treatment based on race, are conclusory, provide no time frame or details about instances of alleged disparate treatment, and fail to indicate whether any of the people involved in the alleged disparate treatment also were involved in dealing with plaintiff. Paragraph 9, which purports to state why plaintiff was terminated, is wholly conclusory. We deny the motion to strike as to the remaining paragraphs of Mr. Bryant's affidavit.

With respect to plaintiff's affidavit, defendant seeks to strike paragraphs 3-4 and 7-8. We grant the motion as to the first sentence of paragraph 7, in which plaintiff states that "defendant has a Handbook which is distributed to Employees." That assertion is contradicted by plaintiff's earlier deposition testimony, in which he stated that defendant did not print out its handbook and never distributed it to its employees (Def.'s 56.1 St., Tab 75, Pl.'s Dep. at 44, 46). "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his . . . previously sworn statement . . . without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999). Plaintiff here has done neither. In all other respects, the motion to strike plaintiff's affidavit is denied.

With respect to the Wicks affidavit, defendant seeks to strike each paragraph of the seven-paragraph affidavit. We grant the motion to strike as to paragraph 2, which states in conclusory

6

fashion that Mr. Wicks witnessed disparate treatment of plaintiff between 1990 and 1998. We deny the motion to strike the remainder of the paragraphs.

Finally, we turn to the motion to strike the two letters, dated May 30 and July 17, 1999, from Mr. Molinary, a lawyer representing Mr. Holman, to Ms. Adamczyk. These letters recite various complaints by Mr. Holman about allegedly racially discriminatory treatment. Defendant moves to strike these letters for lack of foundation and hearsay. As to the foundation point, the Court may consider documents on summary judgment even if a foundation has not been laid, so long as one could be laid at trial. *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637-38 (7th Cir. 2001). Here, defendant's motion does not claim that defendant in fact did not receive the letters, and we expect that a foundation for the letters thus could be laid at trial. As for the hearsay point, we will accept the letters solely for the non-hearsay purpose of showing that Ms. Adamczyk was on notice of various complaints of racial discrimination by Mr. Holman. Accordingly, the motion to strike the Molinary letters is denied.

## III.

With these procedural issues resolved, we now address the factual record before the Court on summary judgment.

### A.

Plaintiff is an African American male, a member of a protected group, as defined by Title VII of the Civil Rights Act of 1965, as amended (Pl.'s 56.1 St. ¶ 1). Defendant is a corporation doing business in Chicago, Illinois and an employer as that term is defined under Title VII of the Civil Rights Act as amended (*Id.*).

Defendant employed plaintiff from 1986 to February 10, 2000. On February 1, 2000, plaintiff (apparently *pro se*) filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging various forms of discrimination by defendant (*Id.* ¶ 3; Def.'s 56.1 St. ¶ 6 (citing DX 29, Original Charge)). The charge alleged: (1) verbal harassment due to a physical handicap; (2) verbal harassment due to race; and (3) verbal harassment due to retaliation for opposing race discrimination in August 1999. The charge indicated that the latest and last discriminatory act took place on January 26, 2000 (*Id.* ¶ 3; Def.'s 56.1 Resp. St. ¶ 3, Tab 45, DX 29).

On February 10, 2000, the defendant fired the plaintiff (Pl.'s 56.1 St. ¶ 5; Def.'s 56.1 St. ¶ 5). Defendant states that it terminated plaintiff for his failure to follow company policies, "among other reasons" (Def.'s 56.1 St. ¶ 11 (citing DX 34; Beeson Affidavit, ¶ 8)). On February 17, 2000, plaintiff filed an amended charge of discrimination (again, apparently *pro se*), adding three additional claims to the initial charge filed earlier (Pl.'s 56.1 St. ¶6; Def.'s 56.1 St. ¶ 12 (citing DX 31, Amended Charge)). Those additional claims were: (1) discharge due to race discrimination; (2) discharge due to physical handicap; and (3) discharge due to opposing race discrimination. According to the charge, all of these incidents took place on February 10, 2000 (Pl.'s 56.1 St. ¶6; Def.'s Tab 47, DX 31). After exhausting the administrative process, plaintiff filed a timely complaint *pro se* in federal court on September 6, 2002. He subsequently hired counsel, who filed an amended complaint (Pl.'s 56.1 St. ¶ 7; Def.'s 56.1 St. ¶ 15).

## B.

At all relevant times during plaintiff's employment and at the time of this termination Judy Adamczyk was defendant's Human Resources Manager. Ms. Adamczyk's duties included preparing the weekly payroll, and she was defendant's contact person with its workman compensation insurance carrier. Her duties included the responsibility to monitor employees injured on the job and to obtain information as to when they could return to work and the type of work they were able to perform (Def.'s 56.1 St. ¶ 18).

On or about Thursday, May 6, 1999, plaintiff suffered a work-related abdominal laceration (Def.'s 56.1 St. ¶ 19). At the time of this injury (and up through his termination), plaintiff was employed by defendant as a warehouse worker (Def.'s Ex. 67, Pl.'s Aff. ¶ 1). Despite being released to return to work on May 7, 1999, plaintiff did not report to work on that date (Def.'s 56.1 St. ¶ 20). On or about May 11, 1999, an Employee Disciplinary Report was prepared against plaintiff as a result of the unauthorized absence on May 7, 1999 (Def.'s 56.1 St. ¶ 21).

Plaintiff thereafter returned to work and, on or about June 16, 1999, plaintiff suffered a work-related abdominal sprain (Def.'s 56.1 St. ¶ 22). Dr. Percy Conrad May, plaintiff's family physician, released him to return to work for light duty for the period July 13, 1999 to July 27, 1999 (Def.'s 56.1 St. ¶ 23). On July 23, 1999, Ms. Adamczyk wrote a memorandum to plaintiff requesting an updated work status report by the beginning of his shift on July 27, 1999 (Def.'s 56.1 St. ¶ 23a). On July 27, 1999, Dr. May wrote that plaintiff was released from his medical care, but directed that plaintiff remain on light duty until July 30, 1999 (Def.'s 56.1 St. ¶ 23b).

At all relevant times, plaintiff's correct home address was 210 N. Mason, Chicago, IL 60644 (Def.'s 56.1 St. ¶ 23c). On July 28, 1999, Ms. Adamczyk sent a letter to plaintiff at his home

address, advising him that she had received a facsimile from Dr. May's office placing him on light duty until July 30, 1999. Ms. Adamczyk requested an updated work status report by the beginning of his shift on August 2, 1999; she also requested that this report provide a date when plaintiff could return to full duty (Def.'s 56.1 St. ¶ 24). On August 1, 1999, Dr. May faxed a letter to Ms. Adamczyk, in which he extended plaintiff's period of light duty for "two more weeks" (Def.'s 56.1 St. ¶ 23e). On August 5, 1999, Ms. Adamczyk wrote a memorandum to plaintiff advising him that Dr. May was unclear on when light duty should end. Ms. Adamczyk asked plaintiff to have Dr. May clarify when light duty would end, and she renewed her request for a projected date when Mr. Holman could return to full duty (Def.'s 56.1 St. ¶ 23f). That updated medical information requested was not provided (Def.'s 56.1 St. ¶ 23g). Thus, plaintiff never provided defendant with a medical directive extending his light duty status beyond August 15, 1999.

On Friday, August 20, 1999, plaintiff suffered a work-related back injury (Def.'s 56.1 St. ¶ 24).[3] On Monday, August 23, 1999, Mr. Holman did not report to work. Instead, plaintiff called John Volpe, defendant's warehouse manager, and requested a vacation day; that request was granted (Def.'s 56.1 St. ¶ 25). In this conversation, plaintiff made no mention of any work-related injury (Def.'s 56.1 St. ¶ 25a). On Tuesday, August 24, 1999, plaintiff again did not report to work. He called Mr. Volpe and requested another vacation day, which he was granted (Def.'s 56.1 St. ¶ 26). Again, plaintiff did not mention any work-related injury to Mr. Volpe (Def.'s 56.1 St. ¶ 26a). On Wednesday, August 25, 1999, Mr. Holman did not report to work. This time, Mr. Volpe contacted plaintiff, and told plaintiff that he was needed at work. However, Mr. Holman refused to come to

---

[3]Plaintiff alleges that this injury occurred while he was assigned to work in the Pipe Shed, which required him to do heavy lifting. Plaintiff claims that this assignment is evidence of racial harassment, since white employees returning to work from injury were allowed to skip a turn on this assignment. We address this point below (*see* pp. 30-31, *infra*).

work, claiming that he was not feeling well. The August 25, 1999 absence was not approved (Def.'s 56.1 St. ¶ 27).

On Thursday, August 26, 1999, plaintiff again did not report to work. He called Mr. Volpe and advised him that he was not feeling well, because he had hurt his back filling pipe on Friday. Mr. Volpe told Mr. Holman to provide information on the result of his doctor's visit by Friday, August 27, 1999 (Def.'s 56.1 St. ¶ 28). On Friday, August 27, 1999, Mr. Holman did not report to work; that absence was not approved (Def.'s 56.1 St. ¶ 30).

On August 30, 1999, plaintiff signed two forms. In one form, plaintiff acknowledged that he had suffered an injury on August 20 and called in for vacation days on August 23 and 24 (Def.'s 56.1 St. ¶ 26b). The second form was a written warning that plaintiff received for failing to report his injury until August 26, 2000 (rather than when it occurred on August 20) in violation of safety rules (Def.'s 56.1 St. ¶¶ 27a, 29). Plaintiff signed the warning. Plaintiff also did not dispute his failure to report the injury on August 20, or during the August 23 and 24 telephone calls, although he quibbled about whether he had first informed defendant of the injury on August 25 (as he claimed) or August 26 (as Mr. Volpe claimed).

Section 306 of defendant's handbook, entitled Workers' Compensation Insurance, effective as of October 1998, provides in relevant part: "Employees who sustain work-related injuries or illness should inform their supervisor or Revere management immediately. No matter how minor an on-the-job injury may appear, it is important that it be reported immediately" (Def.'s 56.1 St. ¶ 59). Section 501 of defendant's handbook, entitled Safety, also effective as of October 1998, provides in relevant part: "In the case of accidents that result in injury, regardless of how

11

insignificant the injury may appear, an employee should immediately notify their supervisor or the Human Resources Manager" (Def.'s 56.1 St. ¶ 60).

**C.**

Following his August 20, 1999 back injury, Mr. Holman was absent from work from August 23, 1999 through December 30, 1999 (Def.'s 56.1 St. ¶ 32). During that time, plaintiff and defendant communicated on various occasions about his return to work.

On September 29, 1999, Ms. Adamczyk wrote to plaintiff at his home address; in the letter, Ms. Adamczyk stated that she had not heard from plaintiff since August 30, 1999, and she requested an update on his work status and return to work date. Plaintiff did not respond to this letter (Def.'s 56.1 St. ¶ 33). On October 29, 1999, Ms. Adamczyk again wrote to plaintiff at his home address, stating that she still had not heard from plaintiff since August 30, 1999, and asking for an update on his work status and return to work date (Def.'s 56.1 St. ¶ 34).

On or about November 1, 1999, plaintiff was examined by an independent medical examiner, Dr. Michael Kornblatt (Def.'s 56.1 St. ¶ 35). Dr. Kornblatt told plaintiff that he could return to work (Def.'s 56.1 St. ¶ 35a), and informed defendant of that assessment (Def.'s 56.1 St. ¶ 36). On November 5, 1999, Ms. Adamczyk wrote to plaintiff and stated that defendant offered light duty work and, in accordance with Dr. Kornblatt's recommendation, plaintiff was expected to report to work on November 10, 1999, for light duty (*Id.*). In that letter, defendant informed plaintiff that a failure to report could result in termination of his employment (*Id.*, at DX 21).

Mr. Holman did not report to work on November 10, 1999 as directed (Def.'s St. ¶ 36a). On that date, plaintiff spoke to Ms. Adamczyk and advised her that he would not be returning to work until after an appointment with Dr. Torres on December 9, 1999. Ms. Adamczyk asked that Mr.

Holman provide her with an update as to his work status and a return to work date after his appointment with Dr. Torres (Def.'s 56.1 St. ¶ 36b). On November 30, 1999, Ms. Adamczyk again wrote to Mr. Holman at his home address. In that letter, she confirmed the November 10, 1999 request for an updated status report and a return to work date (Def.'s 56.1 St. ¶ 37). On December 16, 1999, Dr. Torres issued a "Work Release" regarding Mr. Holman, advising defendant that plaintiff could return to work for light duty on January 3, 2000 (Def.'s 56.1 St. ¶ 38). Plaintiff delivered this work release to defendant.

### D.

On January 3, 2000, Mr. Holman reported to work and was assigned light duty (Def.'s 56.1 St. ¶ 39). On that day, Ms. Adamczyk came into the office in the warehouse where plaintiff was working on light duty and asked him how his back was doing; plaintiff told her to "get out of my face" (Def.'s 56.1 St. ¶ 39a). The next day, January 4, 2000, rather than reporting for work, plaintiff went to Loretto Hospital claiming he had an allergic reaction to Vicodin, a drug he had been taking for several months (Def.'s 56.1 St. ¶ 40). On January 5, 2000, Mr. Holman called in sick and did not report to work (Def.'s 56.1 St. ¶ 41). On January 6, 2000, plaintiff did not report to work, and did not call in to report his absence. However, on that date, defendant received a facsimile from Dr. Torres stating that he saw plaintiff "on an emergency outpatient visit[,]" and that plaintiff could return to work on Tuesday, January 11, 2000, working only light duty "until further notice" (Def.'s 56.1 St. ¶ 42).

On January 11, 2000, Mr. Holman reported to work and was assigned light duty, which continued from January 12 through 14, 2000 (Def.'s 56.1 St. ¶ 44). On Monday, January 17, 2000, Mr. Holman called in sick and did not report for work (Def.'s 56.1 St. ¶ 45). On January 18, 2000,

13

when plaintiff returned to work, Ms. Adamczyk gave plaintiff an envelope containing a written request for a report by January 26, 2000, providing an updated status report and a date by which he could return to full duty. The request contained the admonition that "failure to report this information may be cause for disciplinary action up to and including termination of employment" (Def.'s 56.1 St. ¶¶ 46, 46a and DX 26). Plaintiff acknowledged receiving the envelope containing the request, but claimed that he did not open it; he also did not provide the requested information by January 26, 2000 (Def.'s 56.1 St. ¶ 46b).

Mr. Holman remained on light duty through January 26, 2000 (Def.'s 56.1 St. ¶ 47). On that date, Ms. Adamczyk told Mr. Volpe that she needed to speak to plaintiff, as he had not provided the updated status report, as she had requested in her letter of January 18, 2000. Mr. Holman came into the office, but he refused to speak to Ms. Adamczyk without his union representative, Nick Bryant, present (Def.'s 56.1 St. ¶¶ 48, 48a).

On January 26, 2000, a meeting was held at Revere attended by plaintiff, Mr. Bryant, Ms. Adamczyk, Mr. Volpe, and Paul Figura, another of Mr. Holman's supervisors (Def.'s 56.1 St. ¶ 48b). Ms. Adamczyk asked plaintiff if he had the updated status report that she had requested; plaintiff advised her that he did not, because he was unaware of the request (*Id.*). Ms. Adamczyk stated that the request was contained in the envelope that she had given him on January 18, 2000 (*Id.*). Mr. Holman stated that he did not open the envelope (*Id.*). Ms. Adamczyk responded by telling plaintiff: "well you should open your mail and read it." Plaintiff retorted that, "you are not my mother, you don't tell me what to do" (*Id.*). Plaintiff further stated that he would give Ms. Adamczyk something on February 3, 2000, as that was the date of his next appointment with the doctor (*Id.*). Ms. Adamczyk stated that February 3 was unacceptable, and that she wanted the

14

report by January 28, 2000 (*Id.*). Plaintiff stated that "you will get it on February 3, 2000;" Ms. Adamczyk repeated that the delay was not acceptable, and that she needed to know when plaintiff could return to full duty (*Id.*). Plaintiff then told Ms. Adamczyk to "shut up"; he further stated that it was "none of your business" to know his medical information. The meeting ended when plaintiff "stormed out of the office"(*Id.*).

Following the meeting, plaintiff went into the washroom and put his head under running water. He doesn't know if he slipped or fainted, but he ended up on the floor and a paramedic arrived (Def.'s 56.1 St. ¶ 49). Plaintiff was taken to Mt. Sinai hospital by Tomas Luciano, an assistant supervisor. According to a report prepared by Mr. Luciano, upon gaining consciousness, plaintiff stated that his blood pressure went up (Def.'s 56.1 St. ¶¶ 50, 51).

The next day, January 27, 2000, Mr. Holman called in, but he did not report to work (Def.'s 56.1 St. ¶ 52). In a telephone conversation with Mr. Volpe on that day, plaintiff stated that he could not work until he saw his doctor on Monday (which was January 31) (Def.'s 56.1 St. ¶ 52a). On January 28, 2000, Mr. Holman did not report to work (Def.'s 56.1 St. ¶ 53). On January 31, 2000, defendant received a facsimile from Neurological Services dated January 28, 2000, advising that on January 26, 2000, Mr. Holman had come into Mt. Sinai and was advised to "have home confinement or bed rest and to see his primary care Doctor. He also has [an] appt. to see Dr[.] Torres 2/3/00" (Def.'s 56.1 St. ¶ 54). Mr. Holman failed to call in or report for work on January 31, February 1, or 2, 2000 (Def.'s 56.1 St. ¶ 55). However, while he was away for work, on February 1, 2000, plaintiff filed his initial charge of discrimination with the EEOC and the IDHR[4] (Def.'s Tab 45, DX 29).

---

[4]We note that the parties dispute whether plaintiff told defendant of this charge prior to his termination. Plaintiff contends that he "made defendant aware that he filed the February 1, 2000 EEOC charge on or about February 3, 2000," two days after he filed the charge (Def.'s Ex. 67, Pl.'s Aff. ¶ 3). Specifically, he states that he made defendant aware

On February 3, 2000, plaintiff saw Doctor Torres and complained of headaches; plaintiff was told to return to see Dr. Torres in two months. In the doctor's note concerning that visit, no mention was made of plaintiff's work status (Def.'s 56.1 St. ¶ 56). Plaintiff did not report for work on that day (Def.'s 56.1 St. ¶ 56a); he also failed to provide the medical update he promised to provide to Ms. Adamczyk (Def.'s 56.1 St. ¶ 56b).

## E.

On February 4, 2000, Mr. Holman reported to work. Ms. Adamczyk asked Mr. Holman for medical information she had requested previously, and medical information she needed in order to complete the Workman's Compensation First Injury Report from Mr. Holman's fall in the bathroom on January 26, 2000. None of the requested information was provided (Def.'s 56.1 St. ¶ 57).

Section 307 of the defendant's handbook, entitled Sick Leave Benefits, effective as of October 1998, provides in relevant part: "Employees who are unable to work due to illness or injury should notify their direct supervisor before the scheduled start of their workday if possible. The direct supervisor must also be contacted on each additional day of absence. If an employee is absent for three or more consecutive days due to illness or injury, a physician's statement may be required to verify the disability and its beginning and expected ending dates . . . . Before returning to work from a sick leave absence of 3 calendar days or more, an employee must provide physician's verification that he or she may safely return to work" (Def.'s 56.1 St. ¶ 61).

---

by telling Paul Figura and John Volpe (both supervisory personnel) that "he filed his charge regarding harassment by his supervisors" (*Id.*). The defendant disputes this assertion: Mr. Volpe denies this conversation occurred (*see, e.g.*, Volpe Supp. Aff. ¶ 2), and defendant notes plaintiff's failure to say any such notice was given to defendant when plaintiff filed his February 17, 2000 charge of discrimination (Def.'s Tab 47, DX 32), or when he answered discovery in this case. Moreover, we note that on February 3, 2000, plaintiff concededly was not at work – he did not return until February 4, 2000 (Def.'s 56.1 St. ¶¶ 56a, 57). In any event, given our ruling below, *see* pp. 37-46, *infra*, the dispute about when defendant first learned about the February 1, 2000 charge is not material to the outcome of the summary judgment motions.

Section 701 of the handbook, entitled Employee Conduct and Work Rules, also effective as of October 1998, provides in relevant part: "To ensure orderly operations and provide the best possible work environment, Revere Electric expects employees to follow rules of conduct that will protect the interests and safety of all employees and the organization. . . . The following are examples of infractions of rules of conduct that may result in disciplinary action, up [to] and including termination of employment: Insubordination or other disrespectful behavior, excessive absenteeism or any absence without notice, unsatisfactory performance or conduct" (Def.'s 56.1 St. ¶ 62).

On February 10, 2000, plaintiff was terminated. The termination notice stated that the termination was based on "failure to follow company policies" (Def.'s 56.1 St. ¶ 11 and DX 34). The notice did not elaborate on the nature of the alleged violations of company policy. But, George Beeson, the defendant's Vice President of Finance and the person who made the termination decision, has stated that the failure to follow company policy involved failure to provide documentation for injuries and illnesses as requested; poor work attendance; and insubordination (Def.'s 56.1 St. ¶ 11 (citing DX 2, Beeson Aff. ¶¶ 1, 8)).

Neither Mr. Beeson, nor Mr. Volpe, nor Ms. Adamczyk were ever advised or made aware that plaintiff "was routinely helpful to minorities in their efforts to report violations of their civil rights and file charges based on those reports of the misconduct of defendant" (Def.'s 56.1 St. ¶¶ 63, 65, 67). Nor were they ever made aware that plaintiff had a disability, as defined by the Americans With Disabilities Act. While employed at Revere, Mr. Holman was never regarded by defendant as having a disability (Def.'s 56.1 St. ¶¶ 64, 66, 68).

17

## III.

On this factual record, we now proceed to analyze the plaintiff's claims of discrimination. We will begin with the harassment claims in Counts I and II, proceed next to the termination claims in Counts IV and V, and conclude with the retaliation claims in Counts III and VI. Although these claims are variously alleged as ADA and Title VII claims, the Seventh Circuit allows ADA plaintiffs to prove discrimination indirectly by using the *prima facie* case and burden-shifting method originally established for Title VII cases in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), and refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). *See DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir. 1995). *See also Desert Palace v. Costa*, 539 U.S. 90 (2003).

## A.

In Count I of his amended complaint, plaintiff claims that defendant harassed him based upon his disability, in violation of the Americans With Disabilities Act ("ADA" or "Act"), 42 U.S.C. § 12101 *et. seq.* The Seventh Circuit has not yet recognized harassment as a viable legal claim under the ADA. *Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir. 1999); *Morrisey v. Health Care Service Corp*, No. 02 C 3150, 2004 WL 42369 at *4 (N.D. Ill., Jan. 07, 2004). Yet, in *Silk*, the Seventh Circuit "expressly [held] open the possibility that hostile environment claims are cognizable. . . ." *Morrisey*, 2004 WL 42369, at *4 (citing *Silk*, 194 F.3d at 804 ("We shall proceed on the assumption that a hostile work environment claim is cognizable under the ADA")). Thus, we will proceed based on the assumption that such a claim may be maintained.

To recover on a harassment claim under the ADA, plaintiff must first show a legally cognizable disability under the Act. Then, plaintiff must show the factors necessary to prove that

**18**

there was harassing conduct, based on his disability, that made his work environment subjectively and objectively hostile. *See Silk,* 194 F.3d at 804.

"An objectively hostile environment is one that a reasonable person would find hostile or abusive." *Silk,* 194 F.3d at 804 (citation omitted). In determining whether a plaintiff has met this standard, courts must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). However, the law "does not prohibit all verbal or physical harassment in the workplace." *Oncale v. Sundowner Offshare Services, Inc.*, 523 U.S. 75, 80 (1998). To amount to hostile workplace environment, the harassment must be "so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment.'" *Faragher v. City of Boca Raton,* 524 U.S. 775, 786 (1998) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)). To establish alteration in the conditions of employment, an adverse job action must be shown by either "a tangible employment action (such as discharge, demotion or undesirable reassignment) or a non-tangible action such as discriminatory conduct which is so severe or persuasive that it creates an abusive working environment." *Silk,* 194 F.3d 804-805. The abusiveness of the environment must then be demonstrated both objectively and subjectively. *Id.* at 805.

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual." 42 U.S.C. § 12102(2). Under the Act, a person may be disabled not only because he presently has a physical or mental impairment, as defined above, but also if the individual (a) has a record of such an impairment, or (b) is "regarded

**19**

as having such an impairment." *Sutton v. United Airlines*, 527 U.S. 471, 478, 489 (1999) (discussing both the "record of" and "regarded as" clauses); *Lawson v. CSX Transportation, Inc.*, 245 F.3d 916, 926-27 (7th Cir. 2001) (discussing "record of" disability); *Harrington v. Rice Lake Weighing Systems, Inc.*, 122 F.3d 456, 459 (7th Cir. 1997) (discussing "regarded as" having a disability).

To have a disability within the meaning of the ADA, a plaintiff must also establish that the claimed or perceived impairment is one that "substantially limits" a "major life activity." *Lawson*, 245 F.3d at 923 (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)). This requirement applies across the board, regardless of whether plaintiff establishes an actual disability, disability by a record, or a constructive disability by being "regarded as" having a disability by the employer. *See Sutton*, 527 U.S. at 491. Major life activities refer to activities that are of central importance to an individual's daily life, and include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002); 29 C.F.R. § 1630.2(i) (2005). "Substantially limited" means that the person is either unable to perform a major life function or is "significantly restricted as to the condition, manner or duration" under which the individual can perform a particular major life function, as compared to the average person in the general population." *Dvorak v. Mostardi Platt Associates*, 289 F.3d at 479, 483 (7th Cir. 2002); 29 C.F.R. § 1630.2(j) (2005). The EEOC regulations interpreting the ADA provide that the major life activity of working may be substantially limited if the individual is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i) (2005); *see also, Moore v. J.B. Hunt Transportation, Inc.*, 221 F.3d 944, 953 (7th Cir. 2000) (to demonstrate severe restriction in ability to work plaintiff must present

evidence she is significantly restricted in the ability to perform either a class of jobs or a broad range

of jobs).

Plaintiff contends that his disability was a herniated disc (Am. Compl. ¶ 3), and that

defendant was "aware" and had "full knowledge" of this disability (*Id.,* ¶¶ 8, 13). Plaintiff further

alleges that the defendant, by and through Ms. Adamczyk, verbally harassed him on account of his

disability, causing him humiliation (*Id.,* ¶ 9), which led to him being "rushed to the emergency room

at an area hospital" (*Id.,* ¶ 12). The Court concludes that plaintiff has failed to show a triable issue

on this threshold element of his claim: that he had a "disability, as defined by the ADA."

## 1.

At the threshold, plaintiff has offered no medical evidence or other evidence that the various

health problems and work-related injuries plaintiff experienced prior to his termination included a

herniated disc. What's more, plaintiff has offered no evidence that his alleged impairment created

any substantial limitations on his ability to perform any major life functions. Without evidence of

an impairment that substantially limits a major life activity, there is no ADA violation. *See Sutton*

*v. United Airlines,* 527 U.S. 471, 491 (1991).

## 2.

Nor has plaintiff created a triable issue as to whether he was "disabled" based on there being

a record of disability. On this point, plaintiff offers two categories of evidence, neither of which is

sufficient to avoid summary judgment.

*First,* plaintiff offers a determination by the Social Security Administration ("SSA"), in

which an Administrative Law Judge ("ALJ") found him to be totally disabled and unable to perform

substantial gainful activity. Evidence of a SSA disability finding is not a dispositive factor in ADA

disability determinations, *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802-05 (1999), but, nonetheless, "can be relevant and significant evidence in showing that a disability exists for ADA purposes." *Lawson v. CSX Transportation, Inc.*, 245 F.3d 916, 922-23 (7th Cir. 2001). In *Lawson*, the Seventh Circuit stated the proposition like this:

> [I]n *Cleveland*, the Supreme Court noted that because of differences in the mechanics of the SSA and ADA determinations of disability, a person could be considered disabled by the SSA but yet also be a "qualified" individual with a disability" according to the ADA. Yet it also explained that the two acts were similar enough in this regard to require a person, seeking to show that he is "qualified" to perform a job under the ADA's meaning, to provide a "sufficient explanation" as to how this does not conflict with the SSA's determination that he was "unable to work." . . . [For example,] [t]he Court noted that the SSA does not take into account the idea of "reasonable accommodation" in its disability determination, meaning that an otherwise disabled person according to the SSA could be "qualified" under the ADA when such an accommodation is considered.

*Id.* at 927-28 (cites omitted).

Here, plaintiff argues that "[t]he administrative law judge's decision indicates for social security purposes that [p]laintiff was disabled as of February 10, 2000," which is the date of his termination by defendant (Def.'s Tab 77 (Pl.'s 56.1(b)(3)(B) St. ¶ 9). The plaintiff states that this determination creates "a fact question for the jury as to whether he was disabled prior to that time, but the defendant ignored his condition or behaved in reckless disregard of his condition" (*Id.*).

However, even assuming that the SSA finding would create a genuine issue as to whether plaintiff had a "disability" (or a record of disability) as of the date of his termination, plaintiff has offered no evidence to show that he was qualified to perform the essential functions of his job with or without reasonable accommodation, which is a separate and necessary element of his ADA claim. In the words of *Lawson*, 245 F.3d at 928, he has not offered a "sufficient explanation" – or, indeed,

any at all – as to how a conclusion that he was qualified to perform his job would not conflict with the SSA determination of inability to work.

In addition, the SSA determination, made some time after the November 6, 2001 administrative hearing, is not evidence that defendant was aware of the claimed disability – or a record of it – when it terminated plaintiff on February 10, 2000. In fact, the SSA determination specifically found that plaintiff had "been disabled *since* February 10, 2000" (Def.'s Tab 5, Joint Ex. 1) (emphasis added). Plaintiff cannot create a triable issue on a disability claim without offering some evidence that defendant knew of the claimed disability, *Carter v. Northwest Airlines, Inc.*, 93 Fed. Appx. 944, 946 (7th Cir. 2004); *Rauen v. U.S. Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 895-96 (7th Cir. 2003), which plaintiff has failed to do. Indeed, the undisputed fact is that neither Ms. Adamczyk (alleged to be plaintiff's protagonist) nor Mr. Beeson (who made the termination decision) was aware that plaintiff had a disability (Def.'s 56.1 St. ¶¶ 64, 68).

*Second,* plaintiff points to his employment record, which contains evidence of his medical history, as a "record of" his various medical conditions. However, that evidence does not create a triable issue on whether plaintiff had a record of an *ADA disability*. Again, there is nothing in the medical history to show that defendant was put on notice of any alleged herniated disc condition (*see* Def.'s 56.1 St. ¶¶ 64, 66, 68). What is more, the undisputed facts show that at the time of plaintiff's termination, his doctors had released him to perform "light work" and defendant had accommodated this work restriction by assigning plaintiff to light duty in January 2000. And, the last malady that caused plaintiff to miss work was headaches (Def.'s 56.1 St. ¶ 56) – not a back condition. Thus, even though there may have been a "record" of plaintiff's various injuries and conditions in his personnel file, there is no evidence that the defendant had on file any medical evidence that the back

23

injury plaintiff claimed in January and February 2000 substantially limited his ability to perform *any* work (a major life activity) – or any other major life activity – at the time of his termination.

3.

Finally, we turn to whether there is evidence to create a triable issue on the "regarded as" prong of ADA disability. To be sure, the record shows defendant's awareness of various medical complaints by plaintiff, including his complaint about a back injury that was the stated basis for his absence from work for some four months. The question is whether defendant's knowledge of plaintiff's back injury, his prolonged absence from work, and his light duty status upon return to work (rather than a return to his previous job in the warehouse), creates a triable issue as to whether defendant perceived or regarded plaintiff as having a disability. We conclude that it does not.

The "regarded as" prong of the definition of disability is meant to "cover individuals rejected from a job because of the myths, fears and stereotypes associated with disabilities." *Sutton,* 527 U.S. at 489-90 (quoting 29 C.F.R. § 1630.2(1)). To prove that he was regarded as having a disability, a plaintiff must show that the employer perceives him to be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *Sutton,* 527 U.S. at 491; *see also Williams v. Imperial Eastman Acquisition Corp.,* 994 F. Supp. 926, 931 (N.D. Ill. 1998). "The focus is on the impairment's effect upon the attitudes of others." *Williams,* 994 F. Supp. at 931; *see also Smith v. Warren R. Gregory & Sons, Inc.,* No. IP99-1490-C-B/S, 2001 WL 1691640, at *13 (S.D. Ind., Nov. 21, 2001) (to violate the ADA, a defendant must "erroneously perceive[] the impairment to be more limiting than it actually [was]"). Where the evidence merely shows that management was aware of an impairment, without more specific evidence of an "attitude" about the problem, or evidence of

24

specific unfavorable treatment of the plaintiff that was different than that of other employees who were not regarded as disabled, courts refuse to find a disability under the ADA based on perception. *Williams*, 994 F. Supp. at 931; *cf. Brewer v. Sears, Roebuck & Co.*, 315 F. Supp.2d 295, 297-99 (W.D.N.Y. 2004) (plaintiff with herniated disc on medical leave of absence returned to work on doctor's release but was not given former position due to staffing changes; court held that plaintiff not "regarded" as having a disability under ADA).

When plaintiff returned to work on January 3, 2000 after a four-month absence, Ms. Adamczyk asked plaintiff, "how is your back?" Without more, this knowledge or perception of plaintiff's back injury does not show that he was "regarded" as disabled. *Amadio v. Ford Motor Co.*, 238 F.3d 919, 925 (7th Cir. 2001) ("[I]t is not enough for a plaintiff to show that the employer knew of the plaintiff's impairment"). And, plaintiff here offers nothing more. Plaintiff's doctor released him to light work on January 3, 2000, and defendant assigned him to light work. There is no indication that defendant treated him with special disfavor because of his back injury or perceived him as unable to do the light work that he was released to do and subsequently assigned. To the contrary, the undisputed fact is that defendant never regarded plaintiff as having a disability (Def.'s 56.1 St. ¶¶ 64, 66, 68).

This evidence indicates that the defendant did not see plaintiff as permanently disabled, but rather accommodated his condition with light duty and sought information about when plaintiff would be able to return to full work duties. That kind of conduct does not reflect an "attitude" that plaintiff's impairment was "more limiting than it actually" was. *Smith*, 2001 WL 1691640, *13. As the *Smith* court explained:

25

> [W]e cannot permit an inference that an employer perceived his employee to be *disabled* for purposes of the ADA based solely on its acknowledging his work restrictions and keeping him employed in a capacity limited to those restrictions. We can think of few better ways to encourage employers to discharge employees with impairments (but not disabilities) instead of finding them work that is consistent with their restrictions than by permitting an inference from the employer's acknowledgment of the employee's restrictions that the employer discriminated on the basis of a perceived disability.

*Id.* at *14. The summary judgment record does not show a triable issue on plaintiff's claim of ADA harassment. We therefore grant defendant's motion for summary judgment on Count I.[5]

### B.

In Count II, plaintiff alleges that he was verbally harassed based on race discrimination, in violation of Title VII. In his February 1, 2000 administrative charge, plaintiff based his racial harassment claim solely on the January 26, 2000 statement by Ms. Adamczyk that plaintiff should open his mail and read it (Pl.'s Mem., Ex. A, at 2; Tab 45, DX 29 02/01/00 Charge). In his amended complaint, plaintiff alleges more generally that he and other minorities received "punishments" and "false accusations of infractions of rules and violations of company policy which had not occurred," and that such "misconduct" – which included "verbal harassment" – created "a very hostile working

---

[5]We also note that even if plaintiff had offered evidence to create a triable issue as to whether he was disabled, the evidence is insufficient to create a triable issue on his claim that he was harassed due to that disability. To show legally cognizable harassment based on disability, a plaintiff must establish the following:

> An objectively hostile environment is one that a reasonable person would find hostile or abusive. In determining whether a plaintiff has met this standard, courts must consider all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance . . . . To amount to hostile workplace environment, the harassment must be so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment.

*Silk,* 194 F.3d at 804 (internal citations and quotations omitted). Plaintiff's claim of disability harassment is based on one statement: Ms. Adamczyk's comment on January 26, 2000 that plaintiff "should open his mail and read it." This single statement makes no reference to any alleged disability, and we conclude that no reasonable person would find that this single statement meets either the severity or pervasiveness prong necessary to create an "objectively hostile environment."

environment and continued unabated" from August 1999 through February 10, 2000 (Am. Compl. ¶ 7).

Likewise, in his response brief to defendant's motion for summary judgment, plaintiff argues that his racial harassment claim is based not only on the specific incident of harassment alleged to have taken place on January 26, 2000, but also on other conduct dating back to August 1999 and indeed even earlier (Pl.'s Resp. Mem. at ¶ 6). At the threshold, then, we consider the proper scope of plaintiff's Title VII racial harassment charge, both with respect to time and subject matter.

### 1.

Under Title VII, a plaintiff has 300 days from the occurrence of an allegedly discriminatory act in which to file a timely administrative charge. *Hardin v. S.C. Johnson,* 167 F.3d 340, 344 (7th Cir. 1999) (Title VII); *Huels v. Exxon Coal USA, Inc.,* 121 F.3d 1047, 1049 (7th Cir. 1997). Generally, a Title VII plaintiff is only allowed to seek relief for conduct occurring within the 300-day period preceding the filing of the charge. *Huels, id.* The filing requirement is not a "mere technicality." *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 863 (7th Cir. 1985). It is intended to provide notice to a defendant as to the nature of the allegations and to give the EEOC "an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party [is] permitted to file a lawsuit." *Id.*[6]

In this case, the first administrative charge was filed on February 1, 2000. Plaintiff therefore may not seek to establish liability on, or recover damages for, conduct occurring before 300 days

---

[6]An exception to the time-bar rule is the continuing violation theory, which allows a "plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period." *Mathewson v. Nat'l Automatic Tool Co.,* 807 F.2d 87, 91 (7th Cir. 1986); *Oest v. Ill. Dept. of Corr.,* 240 F.3d 605, 613 n.4 (7th Cir. 2001). However, plaintiff does not allege or argue a continuing violation theory here.

before that date: that is, April 7, 1999. We also note that "evidence of earlier discriminatory conduct by an employer that is time-barred is nevertheless entirely appropriate evidence to help prove a timely claim based on subsequent discriminatory conduct by the employer." *Mathewson v. National Automatic Tool Co.*, 807 F.2d 87, 91 (7th Cir. 1986). "The relevance threshold is low as the evidence need only 'tend' to make the fact of consequence more probable, . . . thus requiring merely a rational connection between the evidence offered by the litigant and the fact of consequence the litigant intends to establish." *Palmer v. Ponderosa System, Inc.*, No. 88 (3803, 1990 WL 60694, at *2 (N.D. Ill. Apr. 18, 1991) (citing *Int'l Merger & Acquisition Consultants, Inc. v. Armac Enter., Inc.*, 531 F.2d 821, 823 (7th Cir. 1976)). Thus, we consider below whether any evidence offered by plaintiff, whether within or outside the 300-day period, creates a triable issue on the Title VII harassment claim.

## 2.

Time is not the only limiting factor for civil rights claims that must be exhausted at the administrative level before proceeding to federal court. The scope or breadth of the allegations in the administrative charge is also a central consideration in determining the scope and breadth of the claim to be adjudicated here.

As a general rule, a plaintiff "may pursue a claim not explicitly included in an EEOC complaint only if [the] allegations fall within the scope of the charges contained in the EEOC complaint." *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 202 (7th Cir. 1996). Only when the complaint's allegations "are 'like or reasonably related to' those contained in the EEOC" charge do they satisfy this standard. *Id.* (internal citation omitted). In other words, there must be a "reasonable relationship between the allegations in the charge and the claims in the complaint." *Cheek v.*

*Western and Southern Life Ins. Co.*, 31 F.3d **497, 500** (7th Cir. 1994). The claim in the complaint must also "reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Id.* The purpose of this rule is to encourage resolution of the dispute during the administrative investigation, as well as to give the employer notice of the employee's charges. *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d **535, 550** (7th Cir. 2002). Therefore, the "EEOC charge and the complaint must, at a minimum, describe the *same conduct* and implicate the *same individuals.*" *Id.* (emphasis in original).

Here, plaintiff's February 1, 2000 charge of racial harassment alleges one harassing event: the statement by Ms. Adamczyk on January 26, 2000. Thus, we must consider whether the other acts of alleged harassment now cited by plaintiff in his summary judgment papers meet the "like or related" standard. After careful review, the Court finds that the allegedly harassing conduct dating back to August 1999 falls within the scope of the charge and are therefore properly considered here.

We base this determination on the fact that the August 1999 conduct alleges verbal harassment, which is the same kind of conduct alleged in the IDHR charge regarding the January 26, 2000 statement. Although the harassing conduct dating back to August 1999 is not alleged with specificity, "an inquiry into the scope of the charge always entails an inquiry beyond the face of the complaint into the legal characterizations that surround the barebones of the factual allegations contained in the charge." *Babrocky,* 773 F.2d at 863. It is difficult to imagine that the IDHR and/or EEOC would not have investigated the charge of racial harassment on January 26, 2000 by looking back at whether other acts of alleged racial harassment had been reported between plaintiff and defendant within the 300-day window.

**3.**

To establish a claim of racial harassment an employee must show: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. *Williams v. Waste Management of Illinois, Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004). After the Supreme Court's decisions in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), we evaluate the fourth prong regarding the basis for employer liability differently depending on whether the alleged harassment was perpetrated by supervisors or coworkers. *Williams*, 361 F.3d at 1029. "[E]mployers are strictly liable for harassment inflicted by supervisors, subject to an affirmative defense when the harassment does not result in a tangible employment action." *Id.*

There are three categories of evidence offered by plaintiff to support his racial harassment claim: (a) plaintiff's assignment to work in the Pipe Shed after his return to work from an injury; (b) Ms. Adamczyk's conduct after his return to work on January 3, 2000 (*i.e.*, the "how is your back" query, and the letter in the pay stub envelope that she did not expressly tell plaintiff about); and (c) the January 26, 2000 meeting, and the conduct of Ms. Adamczyk there. On summary judgment, the Court must determine, from the perspective of a "reasonable person" whether this evidence, alone or in combination, rises to the level of objectively severe or pervasive harassment, sufficient to create a triable issue on the racial harassment claim. We find that it does not.

**a.**

The Pipe Shed assignment is not sufficient evidence of racial harassment to create a triable issue. According to Mr. Bryant, a person returning from an injury is allowed to skip working in the Pipe Shed, and two Caucasian workers were allowed to do so when they returned from injuries (Bryant Aff., ¶ 10). According to Mr. Wicks, this occurred as to one of the Caucasians, Tony Guzzy, in 1995 or 1996 when he was on light duty due to a back injury (Wicks Aff., ¶ 3); there is no evidence as to when this allegedly occurred as to the other Caucasian worker.

We have no evidence as to the supervisor who assigned Tony Guzzy his work in 1995 or 1996, and the absence of that information and the time gap between that event and plaintiff's event in August 1999 undermines the inference that plaintiff suggests. Moreover, plaintiff's own evidence shows that Tony Guzzy was on light duty when he was allowed to skip a turn in the Pipe Shed. By contrast, plaintiff had no doctor's note restricting him to light duty as of August 20, 1999: his doctor's note of August 1 had indicated his light duty status was to extend for two weeks (to August 15), and plaintiff never provided any doctor's note extending that light-duty period (Def.'s 56.1 St. ¶¶ 23e, 23g).

Plaintiff's evidence does not show he was similarly situated with Mr. Guzzy. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) ([t]o be similarly situated, the employees do not need to be completely identical, but must be substantially similar and hold the same or equivalent positions). Accordingly, we conclude that this evidence fails to create a triable issue on the Title VII hostile workplace claim.

**b.**

Similarly, the January 3, 2000 question by Ms. Adamczyk to plaintiff on the first day he returned from a long medical leave due to a back injury, and her delivery of a request to him in an envelope, are insufficient to support a reasonable inference of racial harassment. We do not believe a jury could reasonably find it harassing for defendant's Human Resources Manager to ask an employee returning from four months of medical leave about the physical condition that allegedly caused him to take that leave. Nor is there any evidence whatsoever linking this statement to plaintiff's race. Likewise, in light of plaintiff's response to this question ("get out of my face"), we conclude a jury could not reasonably conclude that it was racially harassing for Ms. Adamczyk to later put a request for additional medical information in writing and deliver it in an envelope that plaintiff reasonably could be expected to open (since, by plaintiff's own testimony, it contained his pay stub (Tab 63, Holman Dep. at 147), rather than make the request orally and risk another like response by plaintiff.

**c.**

Finally, with respect to the January 26, 2000 meeting, the Court finds that Ms. Adamczyk's single statement that plaintiff should open and read the mail is not sufficient to create a triable issue of fact on the claim of racial harassment in Count II. Although plaintiff may have felt that Ms. Adamczyk's statement was insulting or condescending (he responded by saying "you are not my mother, you don't tell me what to do"), this personal and subjective response has to be linked to evidence that would convince a reasonable fact-finder that the statement was based on his race, and was sufficiently severe or pervasive so as to objectively alter his working conditions by creating "a hostile and abusive situation." Plaintiff has offered no evidence that Ms. Adamczyk's statement was

32

motivated by racial animus. There is also no evidence that this single statement was so severely abusive that it would cause a reasonable person to find the work environment plaintiff found himself in on January 26, 2000 to be altered, hostile and abusive.

Granted, we take the plaintiff's argument to be that it was the sum of the total relationship with defendant over the course of a long period of time, at least August 1999 through January 2000, that culminated in his personal and subjective reaction to this statement. However, the three foregoing events do not add up to a triable claim of harassment. The Court therefore grants summary judgment for defendant on Count II.

## C.

We next address Counts IV and V, in which plaintiff alleges that he was terminated on February 10, 2000, based on his race and disability, respectively. Our discussion of the disability termination claim is brief. To establish a claim for termination based on disability under the ADA, a plaintiff must show: (1) that he is a disabled person within the meaning of the ADA; (2) that, with or without reasonable accommodation, he is able to perform the essential functions of the job; and (3) that the employer terminated plaintiff because of his disability. *Dyke v. O'Neal Steel, Inc.,* 327 F.3d 628, 631 (7th Cir. 2003). As explained above, the Court finds that plaintiff has failed to offer evidence creating a triable issue on whether he has a disability within the meaning of the ADA. On that ground alone, his termination claim fails, and we thus grant defendant's motion for summary judgment on Count V.

We thus turn to the claim of termination based on race.

Title VII forbids certain employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" his race. 42 U.S.C. § 2000e-2(a)(1) (2000). The plaintiff seeks to prove race discrimination in Count IV using the indirect method of proof. Using that method, plaintiff must offer evidence that, if accepted, would make a *prima facie* case by showing that: (1) he was a member of a protected class; (2) he was performing his job satisfactorily; (3) the employer took an adverse employment action against him; and (4) the employer treated at least one similarly situated individual outside of his protected class more favorably. *Rhodes v. Illinois Dep't of Transp.,* 359 F.3d 498, 504 (7ᵗʰ Cir. 2004). If plaintiff "were to clear this hurdle," then the defendant "would have to articulate a nondiscriminatory reason for firing him, and in response [plaintiff] would have to put forth competent evidence that the proffered nondiscriminatory reason was a pretext for unlawful discrimination." *Little v. Illinois Dept. of Revenue*, 369 F.3d 1007, 1011 (7ᵗʰ Cir. 2004). In our view, plaintiff cannot clear his *prima facie* hurdle with respect to the second and fourth elements.

As to the satisfactory performance of his job duties, plaintiff offers nothing to counter the undisputed evidence regarding his numerous unexcused absences; his disciplinary reports; his failure to submit medical documentation supporting his continued and prolonged absences from work, despite repeated requests; and his remarks to Ms. Adamczyk, a member of management. Defendant's company policies are clear in stating that such conduct constitutes grounds for termination. Section 701 of defendant's handbook states that employees of the defendant are "at will" employees and thus can be terminated with or without cause. Section 701 also states that

termination may result from "any absence without notice" or "insubordination or other disrespectful conduct."

The only evidence plaintiff offers to satisfy the fourth element, that he was treated less favorably than similarly situated employees outside the protected class, is evidence related to the Pipe Shed assignment, and how two Caucasian employees had not been assigned to that duty after returning to work from an injury. But, even if there was differential treatment of similarly situated people (which, as discussed above, plaintiff's evidence does not support), plaintiff offers nothing to link that conduct in August 1999 with his termination almost six months later. For example, plaintiff offers no evidence that the person allegedly making the Pipe Shed assignment for racially discriminating reasons is the same person who made the termination decision. Accordingly, plaintiff's evidence fails to advance his *prima facie* case on his Title VII termination claim.

Assuming, *arguendo,* that plaintiff had made out a *prima facie* case, defendant would be required to come forward (this is a burden of production and not proof) with evidence of a legitimate non-discriminatory reason for the termination. Defendant has satisfied that requirement, by offering facts showing that plaintiff was terminated for violating company policy and for insubordination (Def.'s Tab 2, Beeson Aff. ¶ 8; Def.'s Tab 4, Adamczyk Aff. ¶ 16). The burden thus would shift back to plaintiff to offer evidence that the asserted reason for the termination is a pretext for discrimination. In other words, plaintiff must offer evidence to show that the asserted reason is "really a lie contrived to mask unlawful discrimination." *Little,* 369 F.3d at 1012. Plaintiff has failed to do so.

The undisputed facts show that plaintiff in fact violated company policy. Plaintiff's employment record shows numerous unexcused absences, failures to report injuries, and failures to

provide requested information concerning his medical status and expected date of return. The undisputed facts also show conduct that an employer reasonably could consider insubordinate. In addition to ignoring specific requests for information, plaintiff told Ms. Adamczyk to "get out of [his] face" when she simply asked about his condition upon his return to work after nearly a five-month absence. In response to comments by Ms. Adamczyk's questioning plaintiff's failure to open mail from the company, he told her that what he did with his mail was "none of her business," and he told Ms. Adamczyk to "shut up."

It was not pretextual for defendant to say these events occurred; indeed, plaintiff has failed to dispute that they did. Nor has plaintiff offered evidence that it was pretextual for defendant to say that this conduct violated company policy and warranted termination.

Plaintiff argues that racially discriminating intent can be inferred from the fact he was fired without defendant following the steps of its 1990 progressive discipline policy (Pl.'s Mem., Ex. C). We disagree. The 1998 version of the Progressive Discipline policy found at Section 716 supersedes the 1990 policy statement, and it states in relevant part:

> Disciplinary action *may* call for any of four steps – verbal warning, written warning, suspension with or without pay, or termination of employment – depending on the severity of the problem and the number of occurrences. *There may be circumstances when one or more steps are bypassed.*

> Progressive discipline means that, with respect to most disciplinary problems, these steps will *normally* be followed: a first offense *may call* for a verbal warning; a next offense *may be* followed by a written warning; another offense *may lead* to a suspension; and, still another offense *may then* lead to termination of employment. If more than 12 months have passed since the last disciplinary action, the process will *normally* start over.

> *Revere Electric recognizes that there are certain types of employee problems that are serious enough to justify either a suspension, or, in extreme situations, termination of employment, without going through the usual progressive discipline steps.*

36

(Def.'s Tab 73) (emphasis added). Plaintiff has offered no evidence to show why the situation here is not one where an employer could bypass the normal progressive discipline process. For example, the undisputed record shows that there were multiple failures by plaintiff to comply with company policy and conduct by him that certainly could be viewed as insubordinate (*e.g.*, telling a management person to "get out of my face" and "shut up"). Plaintiff also has offered no evidence that other similarly situated persons were given the benefit of a progressive discipline process when he was not.

Consequently, the Court finds that this record does not support an inference of pretext based on the content of the defendant's policies regarding termination and the undisputed facts regarding plaintiff's conduct at the time of his termination. Because no reasonable fact-finder could conclude that plaintiff was terminated on the basis of race, summary judgment is granted for defendant as to Count IV.

### D.

We now come to plaintiff's retaliation claims. In Counts III and VI, plaintiff alleges that he was subjected to retaliation by defendant. In Count III, plaintiff alleges that the retaliation took the form of "verbal harassment based on . . . prior civil rights activity" (Am. Compl., ¶ 15). In Count VI, the plaintiff alleges that the retaliation took the form of "discharge[] . . . for his earlier EEO activity" (Am. Compl. ¶ 18). Both counts incorporate by reference paragraphs 6-7 of the amended complaint, which describe his August 1999 complaints to Mr. Bryant regarding defendant's alleged verbal harassment based on race. Both counts also incorporate paragraphs 8-9, which allege that specific incidents of retaliation that occurred on January 26, 2000. These allegations state that "[t]his verbal harassment took place a little over 4 months after [p]laintiff's complaint of discrimination to the

37

union steward." Finally, paragraph 10 of the amended complaint describes plaintiff's termination on February 10, 2000, and alleges that this termination "took place about five (5) months after [p]laintiff's prior complain[t]s of discrimination."

Only the defendant has moved for summary judgment on Count III; but on Count VI, both parties have moved. We will address Count III first, and save Count VI for last.

## 1.

Count III alleges retaliatory harassment based on "prior civil rights activity." In the February 1, 2000 administrative charge, plaintiff claims harassment related to the January 26, 2000 meeting with Ms. Adamczyk, where she said "you should open your mail and read it!" Plaintiff claims that this statement was harassment in retaliation for his August 1999 complaint of race discrimination to his union steward, Mr. Bryant, as well as his activity of helping other minorities file civil rights complaints against defendant (Pl.'s Am. Compl. ¶¶ 6, 15; Def.'s Tab 45, DX 29 (02/01/00 Charge, III.B.(I)); Def.'s Tab 47, DX 31 (02/17/00 Charge, VI.B.(1))).

Title VII forbids employers from taking an adverse employment action against an employee in retaliation for opposing impermissible discrimination. 42 U.S.C. § 2000e-3(a). To prove retaliation under Title VII, using the *McDonnell Douglas* method, a plaintiff must show: (1) he engaged in protected activity; (2) he was treated differently by the same decision-maker than was a similarly-situated employee who did not engage in the protected activity, and who was not in the protected class; (3) this decision-maker imposed an adverse employment action on the plaintiff, even though he was performing his job in a satisfactory manner. *Stone v. City of Indianapolis Public*

*Utilities,* 281 F.3d 640, 644 (7th Cir. 2002); *see also Little v. Illinois Dept. of Revenue,* 369 F.3d 1007, 1012 (7th Cir. 2004).[7]

The Second and Ninth Circuits both explicitly make proof of the employer's knowledge of the protected activity part of the *prima facie* case of retaliation. *Galdieri-Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 292 (2d Cir. 1998); *Gifford v. Atchison, T. & S.F.R. Co.,* 685 F.2d 1149, 1155 (9th Cir. 1982). The Seventh Circuit has assumed that this aspect is implicit in the first element of this Circuit's *prima facie* case under the indirect methodology. *Durkin v. City of Chicago,* 341 F.3d 606, 614, n.4 (7th Cir. 2003). Under *McDonnell Douglas,* if plaintiff establishes a *prima facie* case of retaliation, then the burden of production shifts to defendant to come forward with a legitimate, non-retaliatory reason for its actions. *McKenzie v. Illinois Dept. of Transp.,* 92 F.3d 473, 483 (7th Cir. 1996). If the defendant rebuts plaintiff's *prima facie* case in this manner, the burden shifts back to plaintiff to demonstrate that defendant's proffered reasons for its actions were pretextual. *Id.*

The undisputed evidence bears out plaintiff's theory – at least in part – on the first element, namely, that he engaged in protected activity in August 1999. Properly raising a complaint to management regarding alleged harassment is recognized as a protected activity. *Nielsen v. Acorn Corrugated Box Co.,* No. 01 C 1988, 2002 WL 1941365, at *4 (N.D. Ill. 2002). Here, plaintiff's February 1, 2000 charges allege that plaintiff complained to his union steward, Mr. Bryant, about the Pipe Shed assignment in August 1999, which required heavy lifting, after his return to work from an injury (Def.'s Tab 43, DX 29 (02/01/00 Charge, III.B.1.); Def.'s Tab 47, DX 31 (02/17/00 Charge,

---

[7]Plaintiff does not explicitly state whether he seeks to prove his retaliatory harassment claim – directly or indirectly. But, we presume that the indirect method is being invoked because his arguments regarding Count III relate to issues of pretext (Pl.'s Resp. Mem. at ¶ 8).

VI.B.1.)). That assertion is supported by the affidavit of Mr. Bryant, his Union Steward, who also states that he and the plaintiff had a meeting with management to complain about the Pipe Shed assignment (Bryant Aff., ¶ 10). Granted, plaintiff does not offer evidence regarding which member(s) of management he and Mr. Bryant verbally notified of his August 1999 complaint, nor precisely when they notified management, but we consider Mr. Bryant's affidavit sufficient evidence to raise a triable issue as to defendant's knowledge of the August 1999 complaint.

The same cannot be said for plaintiff's assertion that defendant was aware of his alleged activity in helping other minorities file civil rights claims. Plaintiff has submitted no evidence to show that this other activity occurred. Rather, the undisputed summary judgment record shows that neither Mr. Beeson, nor Mr. Volpe, nor Ms. Adamczyk had such knowledge (Def.'s 56.1 St., ¶¶ 63, 65, 67). Thus, plaintiff has raised a triable issue on the first *prima facie* element only as to the August 1999 complaint to Mr. Bryant.

In any event, plaintiff fails to offer evidence showing a triable issue as to other elements of a *prima facie* case. He has not offered evidence that someone who did not engage in protected activity, but was similarly situated, was treated better than was plaintiff. In Count III, the retaliation that plaintiff claims occurred (that is, the adverse action) is his encounter with Ms. Adamczyk on January 26, 2000. He has offered no evidence that Ms. Adamczyk was involved in the Pipe Shed incident, or had any knowledge of it. Moreover, plaintiff's January 2000 encounter followed several months during which plaintiff violated company policies requiring him to report injuries promptly and to supply medical information, as well as an encounter during which he told Ms. Adamczyk to

40

"get out of my face." Plaintiff has pointed to no employee who engaged in that sort of conduct, but received better treatment than plaintiff did.[8]

Finally, plaintiff offers no evidence to create a triable issue as the third element of the *prima facie* case. A member of "management" – Mr. Beeson – terminated plaintiff on February 10, 2000, based upon the recommendation and information provided by Ms. Adamczyk, another member of management. But, for the reasons explained above, plaintiff has failed to raise a triable issue as to the adequacy of his job performance, in light of the undisputed record of plaintiff's unexcused absences, and violation of company policy.

Because the second and third elements have not been satisfied, the Court grants summary judgment on Count III. However, before turning to Count VI, we have a few comments about plaintiff's evidence – or lack thereof – of pretext. As stated, if and when a plaintiff satisfies the *prima facie* case of retaliation, the next step is for the defendant to articulate a nondiscriminatory reason for plaintiff's termination. Here, defendant asserts that it discharged plaintiff for failure to follow instructions and insubordination. The Court finds that the evidence submitted amply satisfies defendant's burden of articulation.

That leaves it, then, to plaintiff to offer evidence to create a triable issue as to the question of whether defendant's explanation was pretextual. Plaintiff has not even come close to satisfying that burden. Astonishingly, plaintiff makes only a passing argument regarding pretext in the last paragraph of his response brief in the section he devotes to the retaliation claim. In short, plaintiff

---

[8]Plaintiff cites to his evidence that the Guzzys were allowed to skip a turn in the Pipe Shed when they returned from injuries, while he was assigned to work there. In addition to our explanation of why the evidence fails to create a triable issue on whether these individuals were similarly situated to plaintiff, we note that the comparison is inapt here for the further reason that plaintiff does not assert that the retaliatory act was his assignment to the Pipe Shed, but rather an event occurring nearly five months later, which he claims was retaliation for his complaint about the Pipe Shed assignment.

argues that defendant's asserted reasons for **discharging** him – a failure to follow company policy and insubordination – are pretextual because **defendant** failed to follow its progressive discipline policy. In support of that assertion, plaintiff **submits** only a one-page excerpt from an outdated policy manual regarding the defendant's **policy of progressive** discipline in April 1990 (Pl.'s Mem., Ex. D). However, the progressive discipline **language in effect** as of October 1998, which we quoted above, shows that compliance with progressive **discipline** was discretionary. Plaintiff has offered nothing on Count III to create a triable issue **on the question** of pretext.

We grant summary judgment to **defendant on** Count III.

## 2.

We come now to Count VI, the sole **claim** on which both parties move for summary judgment. Plaintiff asserts that he is entitled to **summary** judgment because the undisputed facts allegedly show that "defendant was aware of the **[IDHR]** complaint [filed on February 1, 2000] based on [p]laintiff informing management of his **complaint on** or about February 3, 2000," and that "[o]ne week after informing the defendant of his filing of the complaint, [p]laintiff was terminated by defendant on February 10, 2000." (Pl.'s **Mem. at ¶** 2). Defendant argues that it is entitled to summary judgment because (a) the retaliation **claim is procedurally barred**; and, even if not, (b) there is no evidence from which a jury could reasonably **find** retaliation. We address the procedural point first.

## a.

Defendant asserts that Count VI is **not properly** before this Court because it "exceeds the scope of the predicate EEOC charge" (Def.'s **Resp. Mem.** at 2). Specifically, the defendant argues that a retaliation claim based on the filing of the **February** 1, 2000 charge is not mentioned at all in

the amended charge filed on February 17, 2000, in the section where plaintiff claims that she was discharged in retaliation for openly opposing race discrimination (*Id.*).

Plaintiff's amended charge, filed in February 17, 2000, states as follows:

IV.   A.   ISSUE/BASIS

        1.   Discharge on February 10, 2000, in retaliation for openly opposing race discrimination.

     B.   PRIMA FACIE ALLEGATION

        1.   In August of 1999, I complained about race discrimination with my union representative. Respondent was aware of my complaint.

        2.   On February 10, 2000, I was discharged by Judy A. Adamczyk (white) Manager of Human Resources, for allegedly not following instructions.

        3.   The discharge followed my having filed *an internal complaint of race discrimination* against Respondent *with my union representative*, thereby raising an inference of retaliatory motivation.

(Def.'s Tab 47 (02/17/00 Charge) (emphasis added)). The internal complaint of race discrimination to plaintiff's union representative alleged in paragraph 3 clearly refers back to the August 1999 allegation made in paragraph 1. Thus, defendant is correct that plaintiff's amended charge does not cite the filing of his February 1, 2000 charge as a basis for his termination.

Plaintiff nonetheless argues that this theory of retaliation is within the scope of his amended charge, because it is "inherent in his discharge just one week after" he filed his February 1, 2000 charge (Pl.'s Mem. at ¶ 6). As we have explained earlier, a plaintiff may pursue a claim not explicitly included in the charge only if the claim is "like or related" to the charge submitted to the EEOC. *Cheek,* 97 F.3d at 202. We therefore consider whether a claim that defendant retaliatorily discharged plaintiff because he filed an EEOC charge on February 1, 2000 is "like or reasonably

43

related" to the claim set forth in his amended charge, filed February 17, 2000, that his discharge was in retaliation for the internal complaint he made of discrimination in August 1999.

In *McKenzie v. Illinois Dept. of Transportation*, 92 F.3d 473 (7th Cir. 1996), the Seventh Circuit addressed the question of when a claim of retaliation is like or related to an earlier administrative charge of discrimination. The Seventh Circuit distinguished between cases where the alleged retaliation occurs after the filing of the administrative charge, and those where the alleged retaliation occurs prior to the filing of the charge. *Id.* at 482-83. In the former situation, the Seventh Circuit held that there was no need for a plaintiff to file an amended charge, reasoning that it is "the nature of retaliation claims that they arise after the filing of the EEOC charge," and requiring a second charge based solely on retaliation would "erect a needless procedural barrier." *Id.* at 482. On the other hand, the Court held that where the retaliatory act precedes the filing of the administrative charge, "each of those incidents of retaliation could have been – and should have been – included in [plaintiff's] administrative charges," and those incidents that were not included in the administrative charge, therefore "cannot now serve as the basis of the retaliation claim alleged in her complaint." *Id.* at 483.

Applying the reasoning of *McKenzie* here, we conclude that plaintiff's failure to include in his amended charge a claim that he was discharged in retaliation for filing the February 1, 2000 administrative charge bars plaintiff from pursuing such a claim in this lawsuit. Plaintiff filed his amended charge only seven days after his termination, and only sixteen days after his original charge. By the time he filed the amended charge, therefore, there was no reason for him to omit from that charge a claim that he was fired in retaliation for filing the original charge – if, in fact, that was what he believed or claimed had occurred. Yet, the amended charge expressly stated one, and only one,

basis for plaintiff's claim that he was retaliatorily discharged: that is, that his firing was in retaliation for an August 1999 complaint.

We cannot agree with plaintiff that a claim that he was fired in retaliation for filing an EEOC charge is "inherent" in a charge that expressly states the retaliation was for another reason. Allowing a plaintiff to assert one basis for a retaliation claim in his EEOC charge, and then to shift to another basis for the retaliation claim during subsequent litigation, "would frustrate the EEOC's investigatory and conciliatory role." *McKenzie*, 92 F.3d at 482 (quoting *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994)). Moreover, given that the amended charge cited one specific basis for the retaliatory firing claim (that is, that it was in retaliation for an August 1999 internal complaint), we see no reason to believe that the EEOC would have investigated a different retaliatory discharge claim than the one that was asserted. *See Id.* at 481 (noting that the like or related standard is based on premise that the claim and the complaint "can reasonably be expected to grow out an EEOC investigation in fact of the allegations in the charge"). Certainly, plaintiff has offered no evidence that the EEOC investigation explored the question of whether plaintiff's termination was in retaliation for filing the EEOC charge.

We recognize that plaintiff may have been able to pursue the claim that he was fired in retaliation for filing the first administrative charge on February 1, 2000 had he never filed an amended charge since, under *McKenzie*, "an employee is not required to file a separate EEOC charge alleging retaliation when the retaliation occurs in response to the filing of the original EEOC charge." *Gawley v. Indiana University*, 276 F.3d 301, 314 n.8 (7th Cir. 2001). However, to apply that rule here would require us to disregard plaintiff's amended charge, and the statements he made – and did not make – in it. In this unusual situation, where plaintiff has filed an amended charge

which does not assert retaliation based on an event that previously occurred, we conclude that, under the *McKenzie* reasoning, those unasserted claims cannot now be prosecuted in this lawsuit, "[b]ecause each of those incidents of retaliation could have been – and should have been – included in [plaintiff's] administrative charges." 92 F.3d at 482. Accordingly, we find that summary judgment is appropriate for defendant on Count VI on this basis alone.

But, there is more. This theory of retaliatory discharge not only is missing from the February 17, 2000 charge, but it also is missing from the amended complaint. As we explained above, Count VI alleges that his discharge took place "about five (5) months after plaintiff's prior complain[t]s of discrimination" (Am. Compl. ¶ 10), which plainly refers to his August 1999 complaint to Mr. Bryant and not to the February 1, 2000 charge filed nine days before his termination. Nowhere in the amended complaint did plaintiff link his termination to the filing of the February 1, 2000 charge. Thus, defendant was not given notice of this claim, as required by FED.R.CIV.P. 8(a); and, plaintiff never sought to further amend his complaint to add this theory of retaliatory discharge.

For this reason, even if it were not beyond the scope of the administrative charges, the retaliatory discharge theory plaintiff asserts on summary judgment is not pled, and therefore is not properly a part of the case. And, insofar as Count VI in fact pleads a retaliatory discharge claim, based on the conduct we addressed in connection with Count III, there is no triable issue here (*see* pp. 34-41, *supra*). The Court grants defendant's summary judgment motion as to Count VI and denies plaintiff's summary judgment motion as to Count VI.

## CONCLUSION

It is therefore ordered that defendant's motions to strike are denied; defendant's motion for summary judgment (doc. # 39) is granted as to all claims; and plaintiff's motion for summary judgment on Count VI (doc. # 40) is denied. The Clerk of the Court is therefore directed to enter a final judgment for defendant pursuant to Rule 54. This case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: March 15, 2005**

47